UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 12-22330-CIV-SEITZ

PHYSICIANS HEALTHSOURCE, INC.,

    Plaintiff,

v.

DOCTOR DIABETIC SUPPLY, LLC;
GEORGE T. HEISEL; DDS HOLDINGS, INC.;
and SANARE, LLC,

    Defendants.
_____/

## ORDER CERTIFYING CLASS

This matter is before the Court on Plaintiff's Amended Motion for Class Certification [DE-167]. Plaintiff seeks to certify a class of recipients of a fax that Defendant Doctor Diabetic Supply, LLC ("DDS") allegedly sent in 2008 in violation of the Telephone Consumer Protection Act. For the following reasons, Plaintiff's motion is granted, and the following class is certified: All persons who (1) received Exhibit M [DE-167-15] via facsimile, (2) between June 30, 2008 and July 2, 2008, (3) sent by or on behalf of DDS, and (4) which did not display a proper opt-out notice.

### A. FACTUAL BACKGROUND

Plaintiff Physicians Healthsource, Inc. is a physician group practice. DDS is a nationwide mail-order distributor of diabetic testing supplies founded by Defendant George Heisel. Heisel was the CEO of DDS until February 11, 2011, when Defendant Sanare, LLC acquired DDS from Defendant DDS Holdings, Inc. ("DDSH").

In early 2008, DDS prepared a letter (the "2008 Fax") announcing its selection as an approved provider under a new Medicare policy. Stuart Meltzer, a technical liaison at DDS, created a list of fax numbers to which the 2008 Fax would be sent (the "CBIC

List"). According to Meltzer, the CBIC List included only physicians who had previously prescribed DDS products to their patients. (Meltzer Dep. 56:8–62:7.) The CBIC List includes Plaintiff's fax number. (Biggerstaff Report [DE-167-9] Ex. 1 at 29 ¶ 3,184.)

On June 27, 2008, Meltzer emailed DDS's IT department, attaching the 2008 Fax and the CBIC List, and asked it to send the 2008 Fax to each number on the list. (Class Mot. Exs. L, M [DE-167-14, DE-167-15].) Beginning on June 30, 2008, Prekumar Balwani, a Manager of DDS's IT department, used fax software provided by J2 Global to send the 2008 Fax successfully to 4,324 unique fax numbers, including Plaintiff's. (Balwani Dep. [DE-167-3] 12:10–23, 31:19–32:18, 41:20–42:18, 65:2–18, 66:6–16; *see also* Biggerstaff Supp. Report [DE-194-3].) Plaintiff received the 2008 Fax. (*Compare* Class Mot. Ex. K [DE-167-13] (version received by Plaintiff) *with* Ex. M [DE-167-15] (version attached to Meltzer's email).)

Subsequently, on February 11, 2011, Sanare acquired DDS from DDSH. To effectuate this transaction, DDS, DDSH, and Sanare entered into a Membership Interest Purchase Agreement ("MIPA") [DE-141-1 at 25–100]. In the MIPA, DDSH warranted to Sanare that DDS had materially complied with all applicable laws. (*Id.* art. 3.1(i).) DDSH also indemnified DDS and Sanare against all losses arising out of any breaches of this warranty. (*Id.* art. 9.2(a).) Additionally, certain trusts guaranteed DDSH's indemnification obligations. [DE-141-1 at 101–113.] However, the parties dispute whether the procedural prerequisites for these indemnification obligations have been satisfied.[1]

---

[1] The indemnification claim is currently stayed in state court pending the resolution of this case. *See DDS Holdings, Inc. v. Sanare, LLC & Doctor Diabetic Supply, LLC*, No. 2011-26481-CA-01 (Fla. 11th Jud. Cir. filed Aug. 22, 2011).

Around September 20, 2011, DDS sent Plaintiff and others another fax (the "2011 Fax") which encouraged the recipient to "Call [DDS] Today" because "[y]ou can still receive your CONTOUR® or BREEZE® 2 test strips through the mail." [DE-41-1 at 3.] It is unclear how many received the 2011 Fax.

## B. PROCEDURAL BACKGROUND

Plaintiff filed this case on June 22, 2012, initially asserting only claims against DDS arising out of the 2008 Fax. [DE-1.] Plaintiff later added allegations relating to the 2011 Fax and added claims against George T. Heisel, DDSH, and Sanare. [DE-41.]

On December 5, 2013, Plaintiff moved to certify a class of recipients of the 2008 Fax. [DE-120.] On December 12, 2013, Plaintiff, on behalf of a class of all recipients of either the 2008 Fax or the 2011 Fax, signed a Settlement Agreement with DDS and Sanare and moved for preliminary approval of that settlement. [DE-126.] The settlement contemplated the entry of an $8,720,000 judgment against DDS for all claims arising out of the 2008 Fax and the 2011 Fax. However, Plaintiff agreed "not to execute against DDS or their assets to collect the Judgment, other than (1) against DDS Holdings through operation of DDS Holdings' indemnification obligations; and (2) against the Insurers." (Settlement Agreement [DE-126-1] at 3 ¶ 8.)

Following a hearing, the Court denied both motions and granted leave to file a renewed motion for class certification. [DE-160; DE-161.] The Court denied approval of the settlement because it provided the class with too uncertain a recovery, particularly because the applicable insurance policies excluded coverage for TCPA violations. [*See* DE-158-1 at 14 ¶ 10(j); DE-158-3 at 27 ¶ 2(q); DE-158-4 at 52.] The Court denied class certification with leave to refile so that Plaintiff could address certain procedural inadequacies. On September 17, 2014, Plaintiff filed the instant motion for class certification, seeking to certify a class of recipients of the 2008 Fax.

Since that time, Defendants' financial situation (and the class's practical ability to collect on a judgment) have come into question. According to the uncontroverted declaration of Ken Drazan, the Manager of DDS and Sanare, DDS has been losing money and owes $3 million to a secured creditor. (*See* Drazan Decl. [DE-189-1].) According to counsel's representations at the December 18, 2014 hearing, DDS is winding down and may be insolvent. Moreover, on October 10, 2014, Sanare made an assignment for the benefit of creditors under Fla. Stat. § 727.104 and designated Philip J. Von Kahle as Assignee. [*See* DE-185.] While an assignment for the benefit of creditors does not automatically stay all litigation against the assignee, it does prohibit any "levy, execution, attachment, or the like in respect of any judgment against assets of the estate in the possession, custody, or control of the assignee." Fla. Stat. § 727.105.

### C. APPLICABLE LAW

Under the Telephone Consumer Protection Act (the "TCPA"), any "unsolicited advertisement" sent to a fax machine must meet three requirements. First, the sender must have an "established business relationship" with the recipient. Second, the sender must have acquired the recipient's fax number either directly from the recipient or from a public source where the recipient made its number publicly available. Third, the fax must include an opt-out notice. 47 U.S.C. § 227(b)(1)(C).

An advertisement is "unsolicited" if the recipient did not provide "prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). "[P]rior express invitation or permission must be express, must be given prior to the sending of any facsimile advertisements, and must include the facsimile number to which such advertisements may be sent." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005*, 21 F.C.C. Rcd. 3787, 3811

(2006). Moreover, "the burden of proof rests on the sender to demonstrate that permission was given." *Id.* at 3812.

Although the statute requires an opt-out notice only on *unsolicited* fax advertisements, the FCC's regulations impose the opt-out-notice requirement on solicited advertisements as well. 47 C.F.R. § 64.1200(a)(4)(iv); *see also Nack v. Walburg*, 715 F.3d 680 (8th Cir. 2013), *cert. denied*, 134 S. Ct. 1539 (2014) (upholding the regulation as applying to solicited fax advertisements). As a result, *every* fax advertisement must include an opt-out notice.

On October 30, 2014, the FCC reiterated this regulatory requirement but granted limited retroactive waivers to particular entities and allowed other "similarly situated entities" to seek waivers as well. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 61 Communications Reg. (P&F) 671 (F.C.C. Oct. 30, 2014). DDS has stated that it plans to seek a waiver. However, any such waiver would extend only to fax advertisements sent with the recipient's "prior express invitation or permission"—not simply to any fax advertisement where the sender and recipient had an "established business relationship." *Id.* at 14 n.99. DDS has not yet presented any evidence of express invitation or permission from any recipient.

The TCPA explicitly authorizes private parties to sue for violations and provides $500 in statutory damages for each violation, which functions as a bounty to incentivize private enforcement actions, although it does not provide for an award of attorneys' fees. Moreover, to bring an action under the TCPA, a plaintiff need not suffer any monetary loss or even have seen or printed the fax advertisement. *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 771 F.3d 1274, 1281–83 (11th Cir. 2014).

## D. CLASS CERTIFICATION

Class actions allow claims that would be too impractical to litigate individually to proceed as part of a consolidated action that can address questions common to each claim. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). To certify a class, a court must be "satisfied, after a rigorous analysis," that the requirements of Rule 23 have been met. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id*. A court "can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009).

A party seeking to certify a class must do three things: (1) establish an ascertainable class, (2) meet the requirements of Rule 23(a), and (3) qualify for at least one of the three types of class actions in Rule 23(b). Each shall be addressed in turn.

### 1. Ascertainability

First, the proposed class must be "adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (citation omitted); *cf. John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (an ascertainable class is an "implied prerequisite" of Rule 23). It must therefore be possible to identify the class members on the basis of "objective criteria" and through a "manageable process that does not require much, if any, individual inquiry." *Newberg on Class Actions* § 3.3 p. 164 (5th ed. 2012).

Plaintiff proposes the following class definition:

> All persons who (1) on or about July 1, 2008, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services

>by or on behalf of Doctor Diabetic Supply, LLC and George
>Heisel, (3) which did not display a proper opt-out notice.

[DE-167-1 at 19.] Based on more specific evidence presented to the Court and discussed at the December 18, 2014 hearing (as explained below), the Court will modify the class definition as follows:

>All persons who (1) received Exhibit M [DE-167-15] via
>facsimile, (2) between June 30, 2008 and July 2, 2008, (3) sent
>by or on behalf of DDS, and (4) which did not display a
>proper opt-out notice.

The class meets the ascertainability requirement. As noted above, DDS employee Balwani used fax software provided by J2 Global to send the 2008 Fax to each number on the CBIC List. J2 Global has produced fax records documenting all of DDS's outgoing faxing activity during the relevant period (the "J2 List"). Based on the J2 List and the CBIC List, Plaintiff's expert Robert Biggerstaff determined that the 2008 Fax was successfully sent to and received by 4,324 unique recipients. (Biggerstaff Supp. Report.) To reach this number, he used the following methodology:

1) In reviewing the J2 List, he discovered a comment string "FellowColleagu" in 7,870 fax transmissions, which is consistent with the text of the 2008 Fax. (*See* Class Mot. Ex. K ("Dear Fellow Colleague . . . .").)
2) He then eliminated duplicate fax numbers, which reduced the total number to 5,693.
3) He then eliminated any fax transmission that was not tagged as a fully received, error-free fax transmission. This reduced the total number to 4,324.
4) He verified that all 4,324 of these numbers were also on the CBIC List.

Biggerstaff's methodology is sound and reliable, and it provides a manageable process for identifying class members using objective criteria. Moreover, at the

December 18, 2014 hearing, the Court reviewed the J2 List and independently confirmed Biggerstaff's conclusions.[2] Therefore, the class is ascertainable.

## 2. Rule 23(a)

Second, the named plaintiff must be an appropriate representative of the class whose claims it wishes to litigate. *Wal-Mart*, 131 S. Ct. at 2550. To do so, it must meet the four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable,
> (2) there are questions of law or fact common to the class,
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The class has 4,324 members and thus is numerous. The remaining requirements of commonality, typicality, and adequacy will be addressed in turn.

---

[2] Biggerstaff's initial report determined that that DDS successfully sent 4,559 fax transmissions to recipients on the CBIC List between June 30, 2008 and July 2, 2008. (Biggerstaff Report [DE-167-9].) However, as Defendants pointed out in their responses, it did not foreclose the possibility that some of these 4,559 fax transmissions were faxes other than the 2008 Fax. The Supplemental Biggerstaff Report addresses this concern by eliminating all transmissions that lack the "FellowColleagu" comment string.

Contrary to Defendants' assertions, they had sufficient opportunity to challenge Biggerstaff's conclusions. Plaintiff's counsel stated at the August 20, 2014 hearing that he would hire an expert. Biggerstaff's reports are straightforward analyses of the J2 List and the CBIC List, which were produced in discovery. A deposition was scheduled for October 30, 2014, but Defendants cancelled and never rescheduled. Moreover, in response to oral argument at the December 18, 2014 hearing, the Court reviewed the J2 List and independently confirmed Biggerstaff's conclusions.

### a. Commonality

"Commonality requires that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (citation omitted); *see also Wal–Mart*, 131 S. Ct. at 2551 (a class-wide proceeding must be able to "generate common answers apt to drive the resolution of the litigation" (citation omitted)). This requirement is generally met if "the allegations involve a common course of conduct by the defendant." *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 313 (S.D. Fla. 2001).

In this case, commonality is satisfied. The case revolves around a common course of conduct by DDS and turns on the following overarching questions, which are common to all class members:

- Was the 2008 Fax an "advertisement" under 47 U.S.C. § 227(a)(5)?
- To what extent was Heisel responsible for sending the 2008 Fax?
- Does Heisel's involvement satisfy the requirements for individual liability under the TCPA?

Defendants argue that some of the class members may have established business relationships with DDS or may have consented to receiving the 2008 Fax, and that these are individualized questions that defeat commonality. However, it is undisputed that the 2008 Fax does not contain an opt-out notice. As noted above, the TCPA requires both an established business relationship *and* an opt-out notice on any unconsented advertisement. And even if the recipient consented, FCC regulations require that any fax advertisement include an opt-out notice. Courts routinely certify TCPA class actions precisely because the requirement of an opt-out notice obviates the need to consider consent or established business relationships. *See, e.g., Ira Holtzman, C.P.A. v. Turza*, 728

F.3d 682, 684 (7th Cir. 2013), *reh'g denied (Sept. 24, 2013)*, *cert. denied sub nom. Turza v. Holtzman*, 134 S. Ct. 1318 (2014).

Defendants argue that consent still matters because DDS might be able to obtain a retroactive waiver of the FCC regulation. However, DDS has not yet applied for a waiver. Even if DDS does obtain a waiver, it would only benefit if it could affirmatively prove consent. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005*, 21 F.C.C. Rcd. 3787, 3811-12 (2006) ("[T]he burden of proof rests on the sender to demonstrate that permission was given."). No such proof has been presented as to any class member. And even if DDS could obtain a waiver and prove consent, that would still create another class-wide question: whether the FCC can grant a retroactive waiver that would apply in civil litigation between private parties. *See, e.g., Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 1:12-CV-0729, 2014 WL 7109630, at *14 (W.D. Mich. Dec. 12, 2014) ("the FCC cannot use an administrative waiver to eliminate statutory liability in a private cause of action"). Therefore, DDS's speculation that it might benefit from a hypothetical waiver cannot defeat commonality.

### b. Typicality

Typicality requires that there be "a sufficient nexus . . . between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (quoting *Prado–Steiman v. Bush*, 221 F.3d 1266, 1278–79 (11th Cir. 2000)). Typicality and commonality are similar but differ in that "commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Vega*, 564 F.3d at 1275 (citation omitted).

Typicality is satisfied. The named plaintiff received the same fax as the rest of the class, and his case raises the same factual and legal questions.

### c. Adequacy of Class Counsel

In assessing adequacy, courts primarily consider "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Lyons v. Georgia-Pac. Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000). This requirement applies to class counsel and to the named plaintiff who seeks to act as class representative.

In assessing the adequacy of class counsel, courts "must consider (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1). In addition, courts "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id*.

Counsel is adequate. Counsel's firm Anderson & Wanca is one of very few firms that specialize in TCPA class actions and so is knowledgeable of the applicable law and experienced in litigating TCPA classes. (*See* Class Mot. Ex. CC [DE-167-31].) Moreover, despite the firm's occasional professional lapses, other courts have consistently found them adequate. *See, e.g., Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 704 F.3d 489, 490-91 (7th Cir. 2013) (affirming class certification because counsel's unethical conduct neither prejudiced the class nor jeopardized the integrity of the judicial proceedings).

Of course, just because counsel's firm has been adequate elsewhere does not necessarily mean that it is adequate in this particular case and toward this particular

class. The Court initially had such concerns, which were discussed at the August 20, 2014 hearing. (*See* Aug. 20, 2014 Hr'g Tr. [DE-166] 23–24.) For example, class counsel initially sought to certify two overlapping classes: a class of recipients of the 2008 Fax and a settlement class of recipients of either the 2008 Fax or the 2011 Fax. (*Compare* Mot. for Class Certif. [DE-120] *with* Mot. for Prelim. Approval of Class Action Settlement [DE-126].) The Court denied both motions but allowed counsel to renew his motion for class certification if he could fix certain procedural inadequacies.

Counsel listened, and the amended class certification motion addresses these concerns, including, among other things, by providing a more specific plan for claims administration. Moreover, after receiving the 2008 Fax from Plaintiff's corporate counsel, class counsel has effectively investigated potential claims in this action and has invested significant resources in doing so. Therefore, the Court finds counsel adequate.

### d. Adequacy of Class Representative

Assessing the adequacy of the named plaintiff requires two separate inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (citation omitted).

The first inquiry tends to merge with commonality and typicality because they all assess "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997). In this case,

there are no known conflicts of interest,[3] and the named plaintiff's claim is entirely typical of the class claims.

The second inquiry requires analyzing the named plaintiff's incentives to pursue the rights of the class vigorously. For example, class representatives are inadequate if they have "so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987). Similarly, a class representative may be inadequate if his personal and business relationship with class counsel might incentivize him to place counsel's interests above those of the class. *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003).

Plaintiff is a professional class-action plaintiff who regularly works with Anderson & Wanca to file TCPA cases. While there is generally nothing wrong with being a professional plaintiff—in fact, "[r]epeat litigants may be better able to monitor the conduct of counsel, who as a practical matter are the class's real champions," *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006)—Plaintiff's lack of diligence in this case has raised some concerns. Perhaps it has filed so many cases that it is not focused on protecting every single class it seeks to represent. For example, Plaintiff did not file this case until June 22, 2012—barely a week before the end of the four-year limitations period. This delay may have prejudiced the class's chances for

---

[3]  However, given the timing in filing this lawsuit, it would have been helpful to better understand the relationship between class counsel and Plaintiff's corporate counsel.

meaningful recovery because Defendants' assets dwindled during this period.[4] Moreover, Plaintiff did not conduct any pre-suit investigation, not even to ascertain whether its staff may have consented to receive the 2008 Fax. (*See* Dep. of John Ruch [DE-188-2; DE-189-2] 7:15–10:4; 18:10–15.) And Plaintiff did not review the motion for class certification before it was filed. (*Id.* 23:20–24:2.)

Nevertheless, these do not destroy Plaintiff's adequacy as class representative in this case. First, a class representative cannot be expected to investigate every defendant's financial condition before filing suit, not least because it is difficult to do so without discovery. Even now, while DDS's financial condition is troubled, the record does not allow for definitive conclusions as to the class's practical ability to recover from Defendants, so it is unclear as to when and to what extent the class may have been prejudiced. So although the class may have benefitted if Plaintiff had filed this case earlier, a class representative cannot be deemed inadequate simply for failing to predict that a defendant's finances would deteriorate. Second, while a poor pre-suit investigation would be a problem in other cases, the law in this case requires only a fax advertisement that fails to contain an opt-out notice. A class representative's "duty is to the class he seeks to represent, not some other class he might have attempted to represent." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 688 (S.D. Fla. 2013), *reconsideration denied* (May 30, 2013). For the class Plaintiff seeks to represent, consent is irrelevant. Third, while Plaintiff's lack of knowledge about the case is troubling, "the threshold of knowledge required to qualify a class representative is

---

[4]   Defendants also argue that Plaintiff is inadequate because it was willing to settle with Sanare in exchange for a chance of recovery that was speculative at best. This point is noted but is not dispositive of the adequacy analysis because Sanare was not involved in the 2008 Fax and the proposed class does not include recipients of the 2011 Fax. Moreover, Plaintiff's litigation decisions appear to reflect that it recognizes the futility of seeking recovery for the 2011 Fax.

low." *Bacon v. Stiefel Labs., Inc.*, 275 F.R.D. 681, 694 (S.D. Fla. 2011). Therefore, the Court finds Plaintiff to be an adequate class representative.

### 3. Rule 23(b)

Third, a proposed class must fall within one of the three categories in Rule 23(b). Plaintiffs rely on Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### a. Predominance

Predominance requires that the issues subject to generalized proof predominate over those subject only to individualized proof. This is easily satisfied in this case because, as discussed above, consent is irrelevant and so there are no significant issues subject only to individualized proof. *See, e.g.*, *Ira Holtzman*, 728 F.3d at 684 (affirming class certification).

#### b. Superiority

The superiority inquiry focuses on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1183–84 (11th Cir. 2010) (citation omitted). Relevant factors include "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3); *see also Vega*, 564 F.3d at

1278 n.19 ("[A] complete failure to address these factors or any other pertinent consideration . . . is an abuse of discretion.").

As a general matter, TCPA classes are routinely certified as class actions because the "large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims" all point toward the superiority of a class action. *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 691 (S.D. Fla. 2014); *cf. Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 753 (2012) (noting that plaintiffs are unlikely to pay a $350 filing fee to bring an individual TCPA claim for $500). The same is true in this case: Defendants' conduct was essentially the same toward all class members, and it would be highly inefficient for each plaintiff to have to prove the same facts. *See Sacred Heart Health*, 601 F.3d at 1184 ("[T]he more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims."). Moreover, Defendants have not pointed to any other cases involving proposed class members, so certifying a class action would not undermine any other class members' control over such actions.[5] And a class action poses no particular management problems. Therefore, superiority is met.

Defendants' primary argument to the contrary is that a class action would subject them to potentially ruinous liability on the basis of an unintentional, technical violation of a confusing regulation that caused no economic harm to the class. After all, DDS did not blast faxes to a random set of recipients; it sent a single fax about a significant

---

[5] Defendants argue that a class action is not superior precisely because no other actions have been filed, implying that class members might not view the 2008 Fax as unwelcome or as an unsolicited advertisement. However, the Court cannot speculate as to why others did not sue without judging the merits of this case.

change in Medicare to a specific group of doctors with whom it had previous patient-related fax communications.

To the extent that the Court shares some of these misgivings, they are not appropriate considerations for a court assessing the superiority of a class action. Congress expressly created the TCPA as a "bounty" statute to increase the incentives for private plaintiffs to enforce the law. *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 771 F.3d 1274, 1283 (11th Cir. 2014). There is nothing particularly confusing or complicated about the law's requirement that all fax advertisements include an opt-out notice. 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(4)(iv). And Congress determined that damages of $500 is proportionate for each violation. "That proportionality does not change as more plaintiffs seek relief; indeed, the size of [the defendant's] potential liability expands at exactly the same rate as the class size." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 719 (9th Cir. 2010).

In short, the TCPA reflects Congress's judgment that defendants should face $500 in liability for each fax advertisement that fails to include an opt-out notice. "[I]t is not appropriate to use procedural devices to undermine laws of which a judge disapproves." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). Although assessing superiority under Rule 23(b)(3) may involve assessing the practical benefits to class members of a class action, a court cannot use it as an excuse to save a defendant from this liability simply because there are questions as to Congress's judgment. And the prospect of unconstitutionally excessive liability is not a reason to deny certification of an otherwise valid class—after certifying a class, courts can always reduce an award based on an evaluation of a defendant's overall course of conduct. *Id*.

Eleventh Circuit precedent is not to the contrary. Defendants cite three cases, which are addressed in turn.

*Klay v. Humana, Inc.* noted in dicta that "courts take a harder look" in cases where "the potential damages available in a class action are grossly disproportionate to the conduct at issue." 382 F.3d 1241, 1271 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). However, as noted above, the Court has no basis from which to assess the proportionality of the potential damages. Moreover, as an example of a "harder look," *Klay* cited *Roper v. Consurve, Inc.*, which held that courts should rarely consider the financial impact of a judgment at the class certification stage because doing so "presupposes success on the merits and requires the trial court to express an opinion on the harshness . . . of a particular remedy prior to trial itself," 578 F.2d 1106, 1114 (5th Cir. 1978), *aff'd sub nom. Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326 (1980).

Next, *London v. Wal-Mart Stores, Inc.* noted that economic harm may be required for superiority if the defendants' potential liability for violating "a complex regulatory scheme, subject to different reasonable interpretations" would be "enormous and completely out of proportion to any harm suffered" by the plaintiff. 340 F.3d 1246, 1255 n.5 (11th Cir. 2003). However, this statement was dicta: *London*'s actual holding was that the class representative was inadequate because he had "significant personal and financial ties" with class counsel. *Id.* at 1255. Moreover, the TCPA is not "a complex regulatory scheme, subject to different reasonable interpretations." Therefore, Defendants' citation to *London* is unavailing.

Finally, *Leysoto v. Mama Mia I., Inc.* held that a class action was not superior to individual actions under the Fair and Accurate Credit Transactions Act ("FACTA") for two reasons that were expressly specific to the facts in that case. 255 F.R.D. 693, 698 (S.D. Fla. 2009). First, the class had 46,000 members and the defendant had $40,000 in net assets, so a judgment would bankrupt the defendant only to serve no compensatory function because so much of the recovery would be used up in administrative costs.

Second, the plaintiff's individual action had already brought the defendant into compliance with the FACTA, so certifying a class action would serve no deterrent function. *Id.*

*Leysoto* is distinguishable for two reasons. First, the current record does not allow for definitive assessments of Defendants' ability to pay a judgment or settlement. DDS has been losing money, owes $3 million to a secured creditor, and appears to be winding down. (*See* Drazan Decl. [DE-189-1].) But DDS may be able to seek indemnification from DDSH because DDSH agreed to indemnify DDS against any liability arising out of material noncompliance with any laws, including the TCPA. The indemnification claim is currently stayed in state court. *See DDS Holdings, Inc. v. Sanare, LLC & Doctor Diabetic Supply, LLC*, No. 2011-26481-CA-01 (Fla. 11th Jud. Cir. filed Aug. 22, 2011). The Court therefore cannot conclude that a class action could serve no compensatory function for the class. Moreover, Defendants' financial situation is a class-wide issue that class counsel can investigate if it prevails on the merits. Second, unlike the FACTA, the TCPA includes no provision for attorneys' fees, which makes it more difficult to file individual actions and thus undermines the relative superiority of individual actions under the TCPA. In contrast, by certifying a class, the Court can use its power under Rule 23(h) to mitigate the risk of attorneys' fees swallowing up a significant portion of the class's recovery.

## E. CONCLUSION

Because the proposed class meets the requirements of Rule 23, it is certified. However, the Court retains the power to decertify the class if any of these requirements are no longer met. *See Shin v. Cobb Cnty. Bd. of Educ.*, 248 F.3d 1061, 1064 (11th Cir. 2001)

("the district court retains the ability, and perhaps even a duty, to alter or amend a certification decision" if circumstances change). Accordingly, it is hereby

ORDERED that

1) Plaintiff's Motion for Class Certification [DE-167] is GRANTED.

2) The Court will certify the following class definition: All persons who (1) received Exhibit M [DE-167-15] via facsimile, (2) between June 30, 2008 and July 2, 2008, (3) sent by or on behalf of DDS, and (4) which did not display a proper opt-out notice.

3) The parties shall confer by **Monday, January 12, 2015** about how the class notice should be revised consistent with this Order and the discussion at the December 18, 2014 hearing.

4) The deadline for filing dispositive motions is EXTENDED to **Friday, January 16, 2015**.

DONE AND ORDERED in Miami, Florida, this 23rd day of December, 2014.

*Patricia A. Seitz*
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE