# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### Case No. 12-22330-CIV-SEITZ

PHYSICIANS HEALTHSOURCE, INC.;

      Plaintiff,

v.

DOCTOR DIABETIC SUPPLY, LLC;
GEORGE T. HEISEL; DDS HOLDINGS, INC.;
and SANARE, LLC;

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a bench trial on the remaining issue in this case: whether Defendant George T. Heisel is personally liable to the class, under the Telephone Consumers Protection Act ("TCPA"), for sending the July 2008 Fax (Ex. 1).[1] The Court has considered all of the evidence presented. While the Plaintiff was able to survive summary judgment, it has not met its burden to hold Heisel personally liable under the law. The Court therefore need not address whether the 2008 Fax constituted an "advertisement."

## A. FINDINGS OF FACT

1)    Defendant Doctor Diabetic Supply, LLC ("DDS") was a nationwide mail-order distributor of diabetic testing supplies. Defendant George T. Heisel founded DDS in 2001 and remained its CEO until 2011. His stepbrother, Chris Mehringer, was

---

[1]    On December 23, 2014, the Court certified a class of recipients of the July 2008 Fax. [DE-201.] Before trial, Defendant Doctor Diabetic Supply, LLC ("DDS") stipulated to a consent judgment [DE-235], some claims (including all those against Defendant Sanare, LLC) were dismissed via summary judgment [DE-215], and Plaintiff voluntarily dismissed all other remaining claims [DE-232].

President of DDS until the end of 2007, when he left the company.[2] In the spring of 2008, DDS had approximately 300 employees and at least six senior officers, three of whom ran day-to-day operations: Vice President of Sales Chris Halenar, Billing Director Doug Mee, and Technical Liaison Stuart Meltzer.

2)      The evidence was unrefuted that Heisel's management style was to focus on the big picture and to hire good people who could be trusted with the details. He was the company's main contact with outside counsel, Fulbright & Jaworski, because this helped him control the firm's high legal fees.

3)      Almost all of DDS's customers were Medicare patients, and DDS reached them through direct consumer marketing on websites and other media. Potential customers would see the services available and contact DDS. If a potential customer contacted DDS, DDS would contact the customer's doctor, usually by fax. DDS needed a prescription before it could supply a customer, and doctors would often send prescriptions to DDS via fax. DDS did not market to doctors, via fax or otherwise.

4)      In 2007, pursuant to the Medicare Modernization Act of 2003, the Center for Medicare and Medicaid Services ("CMS") adopted a new reimbursement policy for certain types of medical supplies and set up a competitive bidding program in ten regions called Metropolitan Statistical Areas ("MSAs"). Once the new policy went into effect on July 1, 2008, Medicare would only reimburse customers in those ten MSAs for supplies purchased from providers that had submitted successful bids and with whom CMS had a contract. (*See* Ex. C.)

5)      DDS submitted bids and was selected as an approved provider for diabetic testing supplies in all ten MSAs. However, reimbursements rates under the new program were significantly lower than under earlier Medicare fee schedules.

_____

[2]      Marketing Manager Nino Serafini and Vice President of Operations Ade Batista also left the company around the end of 2007.

Heisel testified that they were even lower than DDS's costs. DDS's strategy was to keep its existing patients in the ten MSAs and hope that the new policy would "blow up."[3]

6)      Heisel testified that Medicare informed its patients about the new policy but did not inform doctors. Instead, it asked providers to communicate with doctors.

7)      In early 2008, Claudio Araujo, Vice-President of Marketing and Technology, worked with Heisel to prepare a press release and a letter announcing the new Medicare reimbursement policy as well as DDS's selection as an approved provider. On April 29, 2008, Araujo emailed drafts of these documents to Heisel and requested that he ask outside legal counsel "whether this would be acceptable." (Ex. 3; *see also* Exs. 5, 6.) The emailed draft letter (the "April 2008 Letter") was an early version of the fax that was sent to Plaintiff and others in July 2008 (the "July 2008 Fax"). (*Compare* Ex. 1 *with* Ex. 5.) There was no indication in the text of the April 2008 Letter that it was intended to be sent by fax.

8)      DDS's legal counsel approved the content of both documents. Heisel's forwarded this approval to Araujo and authorized their use. When asked at trial whether legal counsel knew that the April 2008 Letter would be faxed, Heisel responded that he did not think so because he himself thought it would be mailed. This was the only testimony about whether the April 2008 Letter was vetted, by counsel or otherwise, for compliance with the TCPA.

9)      In June 2008, Stuart Meltzer created a list of fax numbers of physicians in the ten MSAs who were in DDS's database because they had previously prescribed DDS's products (the "CBIC List"). On June 27, 2008, Meltzer emailed DDS's IT department, attaching the 2008 Fax and the CBIC List, and asked it to send the July 2008

---

[3]      In fact, Congress cancelled the results of the first round of bidding and ordered CMS to start over. *See* 42 U.S.C. § 1395w–3(D).

Fax to each number on the list. Prekumar Balwani, a computer programmer, was responsible for sending the July 2008 Fax to the CBIC list.

10)     Beginning on July 1, 2008, DDS successfully sent the July 2008 Fax (Ex. 1) to 4,324 recipients, including Plaintiff. [DE-239 ¶¶ 28–50.] The fax account used to send the July 2008 Fax belonged to "George T. Heisel," which name Heisel shares with his father. The fax account lists an address in Jupiter, Florida and several email addresses which belong to Heisel's father. According to Heisel, his father's credit card was used for certain accounts because his father wanted the credit card rewards.

11)     The July 2008 Fax differed in some ways from the April 2008 Letter that Araujo had sent to Heisel. For example, the July 2008 Fax is more eye-catching, with a bolded and underlined headline telling the reader to "ACT NOW" and some bold paragraphs, whereas the April 2008 Letter looks like a regular business letter, with a "re:" subject line and no bold print. The April 2008 Letter directed the reader to several specific articles about the competitive bidding program, whereas the 2008 Fax only had a general link to the main Medicare website. However, neither the April 2008 Letter nor the July 2008 Fax included an opt-out notice. (*Compare* Ex. 1 *with* Ex. 5.)

12)     There was no evidence explaining the metamorphosis of the April 2008 Letter into the July 2008 Fax or how it was decided to send the letter by fax. Araujo, who drafted the April 2008 Letter and who left DDS in 2012, could not recall how those changes came about.

13)     The only evidence suggesting that DDS, with Heisel's knowledge, had previously used a "blast fax" campaign was a May 2008 email from Cathy Pereira, National Sales Manager for Homediagnostics, to DDS Billing Director Doug Mee, copying Heisel. In that email, Pereira asked if DDS had received "the corrected contract as well as the artwork for the TRUEtrack meter for your fax blast campaign." Mee responded that the contracts had been signed. (Ex. 9.) However, the unrefuted

- 4 -

testimony was that no fax blast campaign for the TRUEtrack meter ever took place. Heisel testified that DDS sometimes bought supplies from vendors like Homediagnostics, and vendors sometimes suggested how to market those supplies, but DDS never contracted to carry out any marketing campaigns by fax.

14)     Thus, there is no evidence that Heisel was personally involved in sending the July 2008 Fax as a fax, other than his sending the April 2008 Letter to counsel and authorizing that it be sent on behalf of DDS as part of a plan to retain existing customers and inform their doctors of a change in Medicare.

## B. CONCLUSIONS OF LAW

The Telephone Consumer Protection Act (the "TCPA") makes it "unlawful for any person . . . to send any . . . unsolicited advertisement" to a fax machine unless certain requirements are met. 47 U.S.C. § 227(b)(1)(C). FCC regulations further require that any advertisement sent by fax, whether solicited or unsolicited, must include an opt-out notice. 47 C.F.R. § 64.1200(a)(4)(iv). If these requirements are not met, the "sender" of the advertisement is liable. "Sender" means "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(1); *see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1257 (11th Cir. 2015) (upholding this definition).

A corporate officer "may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved." *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001). However, in every known case holding a corporate officer personally liable under the TCPA, the officer had either directly committed or knowingly authorized the corporation's wrongful acts. For example, in *American*

*Blastfax*, the individual defendants were the only two officers of a company whose sole business was to send fax advertisements for third parties. Moreover, despite being told repeatedly that their conduct was violating the law, both defendants persisted in sending advertisements up until the day before trial, when they shut down the company and filed for personal bankruptcy. The court found them liable because "to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct." *Id.*; *see also Jackson Five Star Catering, Inc. v. Beason*, No. 10-10010, 2013 WL 5966340, at *4 (E.D. Mich. Nov. 8, 2013) (officer "personally participated in the payment of and authorization for the fax ads"); *Covington & Burling v. Int'l Mktg. & Research, Inc.*, No. CIV.A. 01-0004360, 2003 WL 21384825, at *7 (D.C. Super. Apr. 17, 2003) (individual defendants were the "only officers of Fax.Com" and were involved "with all aspects of Fax.Com from marketing to supervising employees").

The same principle applies in other areas of the law. *See, e.g., S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985) (a corporate officer is personally liable for copyright infringement if he either "personally participates in [the infringing] activity" or "has the ability to supervise infringing activity and has a financial interest" in it); *F.T.C. v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005) (individuals were personally liable because they had knowledge of, and control over, the corporation's deceptive practices); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (officer was personally liable because he himself made the statement that violated the Lanham Act); *United States v. Pollution Abatement Servs. of Oswego, Inc.*, 763 F.2d 133, 135 (2d Cir. 1985) (holding liable "corporate officers who are personally involved in or directly responsible for statutorily proscribed activity"); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1146

(4th Cir. 1975) (directors are "personally liable when they intentionally cause a corporation" to discriminate on the basis of race).

Given the law and the evidence presented, the Court cannot hold Heisel personally liable. This is not a case involving an officer who insisted that his company keep sending mass fax blasts. Heisel approved the April 2008 Letter that became the July 2008 Fax, but the April 2008 Letter looks like an informational letter to be mailed, whereas the July 2008 Fax looks more like a promotional fax. While it is unclear why the content changed or how it was decided to send the letter by fax, there is no evidence that Heisel was involved in either of those changes. And even assuming the July 2008 Fax violated the TCPA, the violation consisted largely of a failure to follow certain technical requirements, such as including an opt-out notice. It would be inconsistent with his management style for Heisel to have been personally involved in technical compliance issues, and there is no evidence of any departure from that general practice.

Nor did Heisel personally authorize that the letter be sent as a fax. Plaintiff argues that Heisel was personally involved in paying for the faxes because Heisel's name was on the fax account. However, the unrebutted evidence was that DDS's fax bills were charged to his father's credit card, not to his. And even if Heisel paid for the fax account, this would not suggest that Heisel specifically authorized sending the July 2008 Fax as a fax because DDS used faxes for routine communication. *Compare with Beason*, 2013 WL 5966340, at *4 (officer wrote a check for "5,000 fax ads").

Plaintiff maintains that Heisel can be personally liable because he authorized that the April 2008 Letter be sent and failed to restrict the manner in which it would be sent, even though he knew that DDS had previously used faxes for advertising. As evidence of Heisel's knowledge, Plaintiff relies on the May 2008 email referencing "the corrected contract as well as the artwork for the TRUEtrack meter for your fax blast campaign," on which Heisel was copied. However, it became clear at trial that no fax blast

- 7 -

campaign ever took place. In fact, the July 2008 Fax was the first mass fax that DDS ever sent. In light of this fact, the most natural reading of the email is that the contract was to buy the TRUEtrack meter from Homediagnostics, not to conduct a fax campaign. Moreover, the unrefuted evidence was that DDS's marketing strategy had never involved advertising directly to doctors or otherwise using fax advertising. DDS's customers were patients, not doctors, and its plan was to maintain its existing customers pending the "blow up" of the competitive bidding program. Therefore, this was one stray email, and it was not sufficient to show that Heisel knew that DDS was using fax advertising or to put him on notice that the April 2008 Letter might end up going out as a fax.

Therefore, based on the evidence presented, the Court concludes that Heisel neither knew, suspected, or should have known that the April 2008 Letter would end up going out as a fax. In light of the conclusion that Heisel is not personally liable, the Court will not address whether the July 2008 Fax constituted an "advertisement" under the TCPA. Accordingly, it is hereby

ORDERED that

1)      This case is CLOSED.

2)      Any pending motions not otherwise ruled upon are DENIED AS MOOT.

3)      Final judgment in favor of Heisel and against Plaintiff will be entered separately. By **June 30, 2015**, Plaintiff's counsel shall certify that it has notified the class of the judgment.

DONE AND ORDERED in Miami, Florida, this _10th_ day of June, 2015.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

- 8 -